45.     Justice Friedman knew that the words "Provided that," and everything that follows, is not in the original contract, and is a clear second attempt to void the rights given in the contract. The words given in the contract can ***only*** be construed as giving air rights to my Unit, so it impossible to believe that she believed what she wrote in her decision. Defendants were told of this and went along with it without acknowledging that anything was amiss or needed to be probed.

46.     Justice Friedman's second attempt at rewriting the description of my Unit also fails because on one side of her mouth she admits that I have "the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be given under applicable law," which means I have air rights.

### D.     There is a Strong Likelihood of Bribery of Justice Marcy Friedman by the Co-op Corporation which Defendants Refused to Investigate

47.     In the May 2010 Minutes of the Shareholder Meeting, the Co-op Board stated that they spent $500,000 in legal fees in 2008 and 2009 for opposing my request for a preliminary injunction, filing a motion to dismiss, and opposing my appeal to the Appellate Division, First Department. The Co-op Board has never disclosed the invoices or checks proving the money was spent on lawyers. The amount is outrageously large and it is impossible that even a fraction of that amount could have been spent on legal fees since it consisted of little more than three motion papers and three short court appearances. Indeed, it is $100,000 more than what *five law firms* spent litigating my entire case against Sherwood and the Co-op Board in 2013-2014, which involved much more extensive motion practice. In fact, when the Co-op Board presented bills in the second litigation, the total was $97,000, which was $400,000 less. Most definitely this money went to bribing judges.

11

48.     Bribery would by the only explanation for why Justice Friedman and four Appellate Division, First Department judges: 1) disregarded undisputed expert testimony; 2) remained adamant that the contract does not mean what it says on its face; and 3) repeatedly rewrote the description of my unit without citing any legal authority or rationale for their attempts to void the rights under the contract.

49.     Investigating bribery would have been very simple for Defendants. All they needed to do was ask to see the checks written to attorneys by the co-op corporation and seeing if they match the $500,000 the co-op claims to have spent in the 2008-2009 litigation.

50.     Regardless of whether the Justices were bribed or not, Justice Friedman and the Appellate Division Justices were being corrupt because certainly they did not believe the interpretations that they gave in the July 2, 2008, March 13, 2009, and February 11, 2010 decisions. Defendants know this fact, which is why for years they have refused to ask the judges to explain why the contract does not mean what it says on its face, and by what legal authority or rationale they used to rewrite the description of my unit in order to void the rights under the contract.

## II.     April 22, 2009:  My First Formal Complaint Before the Commission on Judicial Conduct Unit

51.     On April 22, 2009, I filed my first formal complaint with the Commission of Judicial Conduct. I pressed for Justice Friedman's removal and demanded that the Commission take action in the face of blatant corruption.

> Although the Court of Appeals has determined that removal was warranted for a single instance of "deliberately deceptive conduct," I have given the Commission over a dozen examples proving that Justice Marcy Friedman acted with "deliberately deceptive conduct."
>
> It is impossible that the Court could not see how the footnote allows me to add floor area to the premises by utilizing any available permissible rights.

I have provided the Commission with a mountain of evidence that the court acted with shameful bias and delivered decisions that became crueler each time she ruled.

52.     I informed the Commission that according to the Court of Appeals, one single instance of misconduct is necessary to trigger their duty to have that judge removed. I gave the Commission members case law stating that the Court of Appeals has determined that removal was warranted for a single instance of "deliberately deceptive conduct," since such behavior is "antithetical to the role of a judge who is sworn to uphold the law and seek the truth," *Matter of Heburn*, 84 NY2d 168, 171 (1994).

53.     The judicial corruption that I brought to the Commission's attention was far worse than a judge's behavior being "antithetical" to their role. This was blatant, deliberate criminal corruption on the part of Justice Friedman, corruption which grew to encompass the Appellate Division Justices after they refused to take appropriate action.

A.      **On September 2, 2009, The Commission on Judicial Conduct Sent Me a Boilerplate Reply Informing Me They had Dismissed the Complaint Claiming "there is insufficient indication of judicial misconduct to justify judicial discipline."**

The State Commission on Judicial Conduct has reviewed your letter of complaint dasted [sic] April 22, 2009. The Commission has asked me to advise you that it has dismissed the complaint.

Upon careful consideration, the Commission has concluded that there was insufficient indication of judicial misconduct to justify judicial discipline. The Commission is not a court of law and does not have appellate authority to change a judge's decision or to review the merits of matters within a judge's discretion, such as the rulings in a particular case. *Judges by law have broad discretion in such matters, and the law precludes the Commission from in interfering in that direction.*

The Commission cannot provide legal advice or otherwise assist you with respect to your case. Only an attorney can advise you as to your legal rights and the remedies available in a court of law.

13

### a. I was Devastated that 11 People Could be so Corrupt in Claiming They Saw Nothing Wrong, Effectively Collaborating with Justice Friedman

54. Prior to this suit, I had never experienced the New York judicial system. I had never experienced such corrupt people without any integrity. The news that the Commission on Judicial Conduct was an accomplice to Justice Friedman's was a shock that I had never experienced before.

55. A few days after receiving the letter from the Commission, I was admitted to New York Presbyterian Medical Center emergency room because of "suicide ideation." According to a November 7, 2011 letter by Cynthia Jalando-on, an adult psychiatrist at the hospital:

> According to its record from that date Mr. Brady was feeling hopeless due to the litigation and his financial situation. He was then admitted to the inpatient psychiatric unit. He was diagnosed with Bipolar II Disorder. He was required to stay in the hospital until December 18, 2009. During that time, he was treated with divalproex, haloperidol, and lorazepam. He was referred for psychiatric outpatient treatment.
>
> The undersigned concurred with the diagnosis of bipolar disorder. He is currently being treated with Seroquel, bupropion, and divalproex. He is compliant with his treatment.

56. It was explained to me that overwhelming pressure and stress are some of the primary things that trigger the disease of bi-polarity. For the following years, I have had to take medication for stress to control this disease triggered by the vicious and cruel corruption of the New York judges and Defendants.

57. Upon being releases, I found myself having to deal with more corruption that continued to try to break me rather than protect me. Little did I know then that the worst was yet to come.

58.     My wife and I were the only people given the use of the premise's development rights, and every single justice and defendant refused and continue to refuse to give us equal protection under the law.

### B. Four Months After the Commission on Judicial Conduct Let Justice Friedman Off the Hook, Four Appellate Division, First Department Justices Retaliated by Doing Their Own Corrupt Rewriting of the Contract Without Any Concern they would be Held Accountable for Their Actions

59.     On February 11, 2010, the Appellate Division issued a deliberately contradictory and internally inconsistent decision that again rewrote the description of my apartment in another attempt to order to void my rights under the contract.

> Order and judgment (one paper), Supreme Court, New York County (Marcy S. Friedman, J.), entered March 26, 2009, to the extent appealed from as limited by the briefs, that defendant 450 West 31st Owners Corp. is the owner of the transferable development rights granted or permitted to the parcel of land on which the cooperatively owned building is located, and that paragraph 7 of the second amendment to the offering plan does not convey or reserve those rights to plaintiffs, and that plaintiffs have the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law, unanimously affirmed, without costs.
>
> Paragraph 7 of the second amendment to the offering plan contains no express language giving plaintiffs ownership of or veto power over the building's development rights or air rights (*compare Jumax Assoc. v 350 Cabrini Owners Corp.*, 46 AD3d 407, 408 [2007] ["roof rights reserved for (plaintiff) in the 1986 offering plan"]). It reserves for plaintiffs the right, as [*2]permitted by the relevant laws, to construct or extend structures on the roof that may be built without the use of the building's development rights. Concur—Mazzarelli, J.P., Acosta, Renwick and Freedman, JJ. [Prior Case History: 2009 NY Slip Op 30599(U).]

60.     In this decision, it is shown that these four Appellate Division Justices also engaged in corruption by unlawfully rewriting the description of my contract from the way it was promised and described in the amended Offering Plan. As shown, the terms and conditions with

which they surrounded the Footnote made the contract illogical and internally inconsistent, the same way it did when Justice Friedman unlawfully rewrote the contract.

61. The contract as written states the following:

> "[Seventh Paragraph – New] The 12th floor and roof unit shall have, in addition to the utilization of the roof, the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law."

62. In affirming the March 13, 2009 decision, the court leaves these words intact, without Justice Friedman's unlawfully added provision. But after the court dismissed the July 2, 2008 decision as academic, the judges made an illogical dicta statement that the contract only gives me "the right, as permitted by the relevant laws, to construct or extend structures on the roof that may be built without the use of the building's development rights."

63. The judicially-constructed assertion that I was given the right to build structures without the use of the building's development rights is nonsensical because in New York one cannot build structures on or above a roof without the use of development rights. This is fact the judges are well aware of.

### C. In March 2010, a reargument motion was made to the Appellate Division, and alternatively for leave to appeal to the Court of Appeals, in which I clearly pointed out the decision was illogical and conflicted with the defendants' own admissions

64. Below is an excerpt of the exact argument made on page two of my motion:

> "This Honorable Court has added an entire phrase, *"that may be built without the use of the building's development rights"* to an unambiguous and broad grant of rights to the Bradys, thereby ***rewriting the contract and depriving the Bradys of the rights the defendant-respondents themselves both concede the Bradys possess*** *in their papers before the lower court and this Honorable Court*.

16

"This Honorable Court's decision depriving the Bradys of any right to construct anything requiring floor area ration (i.e. virtually anything except mechanical space) cannot be permitted to stand in light of the admissions in the Defendant-Respondent's Brief, wherein Stanley Kaufman, Esq., attorney for the defendant-respondent, confessed to the clear and logical meaning of the Paragraph 7:

> ***"A clear and logical meaning of the added footnote number seven of the second amendment was to grant the 12th floor owner some latitude in adding additional structures, so long as in doing so, the owner did not endanger anyone else's health or safety or violate the Building Code, <u>Zoning Law or any other laws and ordinances.</u>"***

The identical admission is also made by defendant-respondent Extell in its Reply memorandum of law:

> "The amendment refers only to the use of the roof and the right to construct or extend the roof's existing structures. It did not, nor could it, mention the right to own, or 'control' development rights that did not then exist or that the future be transferred by a Cooperative to another landowner for profit. Rather, ***the clear intent was to grant the 12th floor unit owner some latitude in adding space, or structures, so long as in doing so the owner did not violate any local building code, <u>Zoning regulations, or other ordinances.</u>***
>
> "The intent is evidenced in the decision of the original owner of the 12th floor unit to build an 1,800 square foot penthouse on the roof."

Defendant-respondent Extell further conceded: "As evidenced in the paragraphs above the meaning and intent of the paragraph was not to limit the 12th floor and roof unit

17

to building only structures that are built" without the use of the building's development rights," as this court has mistakenly determined in its earlier decision:

> "[t]he right to construct or extend structures upon the roof or above the same to the extent permitted under applicable law ***has a definite and precise meaning, i.e. that structures may be built or extended so long as they do not violate the Penal Code, or do not transgress any other law or statute, regulation or code.***"

Where defendant-respondents themselves admitted that the provision in question permits construction "so long as in doing so, the owner did not endanger anyone else's health or safety or violate the Building Code, Zoning Law, or any other laws and ordinances," this Honorable Court's decision to the contrary simply cannot stand.

### D. The Appellate Division Justices Remained Entrenched in Being Corrupt with a Likelihood of Bribery

65. Bribery is the only thing that could explain why four Appellate Division Justices would unanimously agree with an interpretation of the contract that is not supported by any legal authority and which contradicts defendants' own inadvertent admissions – and makes absolutely no sense.

66. Nothing I said in my reargument motion moved the judges away from their unjust, illogical and clearly corrupt February 11, 2010 decision.

67. My reargument motion and my alternative motion for leave to appeal to the Court of Appeals were both "Denied" without a word of explanation or justification.

68. For years, I repeatedly told the Defendants about these Justices unlawful actions, yet they refused to ask the judges 1) why the contract does not mean what it says on its face, and 2) by what legal authority or line of reasoning did they use to feel entitled to rewrite my contract to void the rights given in the contract.

69. The reasons the Defendants would not ask these two questions of the Justices is because they knew the Justices would not be able to provide a believable reason, and that would prove they are corrupt.

70. Defendants behaved with depraved indifference and gross negligence in conducting their duties. Defendants part in the conspiracy was to ensure the judges were never asked, by themselves or any other agency or judicial watchdog, the two questions that would prove corruption.

### E.  In 2010, the Court of Appeals Smelled Corruption

71. Although my motion for leave to appeal to the Court of Appeals was denied by the Appellate Division, the Court of Appeals protected me. The Court of Appeals intervened and made the Co-op Corporation sign a stipulation dropping all counter claims against me, while leaving me with the right to sue the Co-op Corporation for damages caused by the attempted transaction with Extell Development Corp. The Court of Appeals would not have stepped in had it not smelled corruption.

72. Once the Stipulation with the Co-op was signed on September 10, 2010, the Court of Appeals denied the motion. In other words, the court had partial integrity but did not fix the problem. The Court left me with a contradictory decision which, nevertheless, should have prevented a future sale of the development rights by the Co-op without a waiver from me since the final decision included the words "pursuant to paragraph seven, plaintiffs have in addition to the utilization of the roof, the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law," which means I have the right to utilize the premise's permissible air rights.

19

### F. In 2011, Sherwood Equities purchased the lot formerly owned by Extell and relayed a message to me that "they knew they had to pay the piped piper," and "did not want to end up like Extell."

73. Sherwood and the Co-op knew that I had a February 11, 2010 Appellate Division decision that stated the following rights were given to me:

> that plaintiffs have the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law, unanimously affirmed, without costs.

74. It was this difference between what was already built and what could be built that Sherwood wanted to purchase. Sherwood knew they needed a waiver or they would be tortiously interfering with my contract with the co-op corporation.

75. Although Sherwood Equities originally admitted they would need a waiver before purchasing the air rights, I later learned that they would take a different position and try to argue I lost the prior litigation, and *res judicata* and collateral estoppel would prevent me from seeking damages if they closed without a waiver.

#### a. In April 2012, Two Board Members Approached my Wife and I Seeking a Waiver of Our Rights

76. Priscilla Mcgeehon and Karen Atta requested a meeting and came to our apartment. They said that if we agreed to waive our rights, the Co-op Board would admit that we had development rights, and they would allow us to purchase back some air rights using a temporary bonus fund then-available.

77. We told Mcgeehon and Atta their offer made no sense. Why would we waive our rights for free in order that the co-op admit we have those rights? We then asked what kind of money they would offer us, they said they would get back to us, but never did. Rather, we received a threatening letter from the Co-op's litigation attorney.