### b. On April 12, 2012, I Received a Threatening Letter from the Co-op's Litigation Attorney Warning Me to Waive My Rights

78. In the letter, Stanley Kaufman said the Co-op Board was demanding a waiver from us and was not offering to pay anything for it. The letter stated:

> "your choice not to sign the requested waiver may result in further costly litigation involving 450 West, the purchaser, and you."

79. After that threat, Mr. Kaufman sent us a waiver a week later, and asked that we sign it and return it to Sherwood's transactional attorney, Herrick Feinstein LLC.

80. The Waiver, Consent and Release states that my wife and I are being asked to relinquish our rights "For good and valuable consideration, the receipt and sufficiently of which is hereby acknowledged." The only consideration 450 Owners Corp. and Sherwood offered me, however, was the threat of costly litigation against the two of them if we did not agree to waive our rights for free.

81. The "Waiver, Consent and Release" outlines the rights I was asked to relinquish under threat of litigation:

> (1) Waives any right they may have to execute that certain Declaration of Zoning Lot Restrictions to be entered into by and between 450 Corp. and Sherwood respecting the Premises and certain adjoining properties (…)
> (3) <u>releases of Excess Development Rights</u> (as defined in the ZLDEA) from any claims, right, title or interests Releasor may have in same, (b) <u>waives any right to construct improvements in the Developer's Easement Area</u> (as defined by the ZLDEA); and (c) waives any claim, at law or in equity, that Releasor may have against 450 Corp. and/or Sherwood (i) <u>asserting that Releasor is entitled to compensation</u> on account of 450 Corp.'s sale of the Excess Development Rights, (iii) asserting that Releasor is entitled to compensation for the purchase or use of the Reserved DIB FAR.

### c. After Failing to Obtain the Waiver, the Co-op Board Went into Lockdown Mode and Closed the Transaction in Secret

82. The co-operative corporation By-laws require annual shareholder meetings in May of each year. The May 2012 meeting was canceled by the Board to keep my wife and me in

21

the dark as to what their next move would be, and to prevent us from seeking to prevent the sale, as we successfully did when Extell sought to purchase the rights. This fact is proven by reading the meetings of the Shareholder Meeting of September 18, 2012, during which the Board announced:

> [The Board] had finalized the sale of its development rights to Sherwood Equities, the company constructing a building on the adjacent site. They sold for $11,500.000. The mortgages [of 450 West 31st Street] were paid down and a reserve fund has been set aside for improvements to the building. $2,000,000 is being distributed to shareholders at $8,810.57 per share. The building is left with virtually no debt.

83.     Thus, the Board negotiated the entire sale in secret and announced it to the shareholders as a *fait accompli* without any input from my wife and me, and simultaneously spent and dispersed funds from the sale.

### d. As I Informed Defendants, I Filed Two Suits in State Court and Expressly Demanded They Monitor for more Judicial Corruption

84.     On November 23, 2013 I filed a Complaint in Manhattan Supreme Court (No. 157779/2013) against the Board of Directors of 450 West Owners Corp., individually and as members of the Board, and their attorneys, Greenberg Traurig LLP, Kaufman, Friedman, Plotnicki & Grun, LLP, and Hanley & Goble.

85.     The Complaint alleged breach of contract and breach of the covenant of good faith, tortious interference with contract, gross negligence, prima facie tort, negligent misrepresentation, fraud, declaratory relief, and violations of Judiciary Law §487 against the attorneys.

86.     A second Complaint (No. 654226/2013) was filed on December 06, 2013 against defendants Jeffrey Katz, individually and as CEO and principal owner of Sherwood Equities, Inc., Long Wharf Real Estate Partners, LLC., Chicago Title Insurance CO., Dennis W. Russo,

Esq., Herrick, Feinstein, LLP., Frank McCourt individually, and as Chairman & CEO of McCourt Global LP.

87. The second Complaint asserted tortious interference with contract, unjust enrichment, aiding and abetting of breach of fiduciary duty, conspiracy to defraud, slander of title, and that McCourt Partners were not *bona fide* purchasers for value.

88. Between them, the Complaints asserted that the transaction between the Co-op and Sherwood Equities violated both the Offering Plan contract, and my adjudged rights pursuant to the Supreme Court's March 13, 2009 Order, Adjudged, Declaration.

89. Defendants requested that the case be moved to the Commercial Division, where a small group of judges with ties to their firms hold court. Defendants asked that the case be put before Justice Marcy Friedman, but she recused herself and the case went before Justice Kornreich.

## III. The Strategy of Arguing that I Lost the Prior Litigation Completely Unraveled at the March 18, 2014 Hearing

90. At the March 18, 2014 hearing, both Defendants and Justice Kornreich admitted repeatedly that the words in the affirmed decision and the contract gave me the right to build additional structures above the roof, and that any assertion to the contrary makes no sense.

91. In a hearing on March 18, 2014, Justice Shirley Kornreich, Manhattan Supreme Court, Commercial Division, revealed her true understanding of the Offering Plan and the February 11, 2010 decision:

> THE COURT: How would you deal with the decision of the Court and say he has no development rights, he has no air rights, yet he has the right to build? What does that mean? (Transcript p. 9:17-20).

> THE COURT: The courts said that he has no air rights, but he has the right. But I think, perhaps, the courts didn't understand that air rights, FAR, all of that is probably the same things, development rights, so – (Transcript p.12:9-13).

23

THE COURT: I don't know what you said. Nor do I know what the Court said. (Transcript p. 14:12-13)

THE COURT: But I'm asking you because I have to in this action decide what the contract means, and I'd like your – you to weigh in on that. (Transcript p. 15:25-p. 16:2).

THE COURT: The decisions don't – don't address this, because, at least in this Court's mind, I don't see how you can build and build up without going into air rights or – you know, so I don't understand the decisions. I'm asking you for guidance. (Transcript p. 17:18-22).

**THE COURT: And the Appellate Division and lower court doesn't say, "You can only build to a certain height," they said "Yeah, he has the right to build up and out but he can't use the air rights," which is really an enigma. (Transcript, p. 27:3-29:3).**

**THE COURT: I don't understand how you can build a structure on a roof if you have no air rights.** (Transcript p. 28:4-5).

Mr. BRADY: So the correct reading it's an inconsistent decision. Please square the two, Your Honor. Square –

THE COURT: I don't know how. (Transcript p. 53:17-19).

THE COURT:  – it was the sponsor who put this in, it was the sponsor who owned the penthouse and roof. <u>Perhaps that was his intent</u>. However, I can't rule that way because the Supreme Court already ruled and the Appellate Division already ruled that you do not own those air rights. (Tr. p. 54:11-20).

### A.     <u>Defendants are Proven to be Cruel and Corrupt</u>

92.     The admissions made by Justice Kornreich at the March 18, 2014 oral arguments prove that anyone looking at the Supreme Court and Appellate Division decisions immediately sees they make absolutely no sense, and are illogical and internally inconsistent. Yet none of the Defendants admitted seeing anything at all wrong or worthy of a probe. This included the Manhattan District Attorney's Office Chief of Public Integrity, Daniel G. Cort, refusing to acknowledge seeing anything corrupt, and refusing to ask the Justices a single question was their part in the conspiracy to defraud me of the rights given to my apartment through the Offering Plan contract.

**B.    The Argument that I Lost the Prior Litigation Further Unraveled When Defense Attorney After Attorney Admitted that the Language in the February 11, 2010 Appellate Division, and the Offering Plan, gave me Development Rights, and that the Additional Language Made No Sense**

Joseph Augustine, attorney for the Co-op Board

*THE COURT: -- which means you're going to have to commit the coop board to tell me: What does Paragraph 7 mean?*

*MR. AUGUSTINE: It means he has the right to build structures once he submits a plan. And if those structures are permissible by law, such as Department of Buildings, and those plans do not pose a structural risk or any other risk to the building in order to -- for him to service the space that he has there, then the board would be inclined to approve it.*

...

*THE COURT: But what I'm saying is he does have that right, though, under paragraph 7.*

*MR. AUGUSTINE: He has -- our understanding he has a right to build structures. That's what it says. No one disagrees. The courts all said the same thing, he has a right to build structures.*

*THE COURT: Well, the courts didn't say that. The courts said that he has no air rights, but he has the right. But I think, perhaps, the courts didn't understand that air rights, FAR, all of that is probably the same thing, development rights, so --*

...

*MR. AUGUSTINE: He has -- our understanding he has the right to build structures. That's what it says. No one disagrees. The courts all said the same thing, he has a right to build structures.*

*THE COURT: Well, the courts didn't say that. The courts said he has no air rights, but he has the right. But, I think, perhaps, the courts didn't understand that air rights, FAR, all of that is probably the same thing, development rights, so --*

*MR. AUGUSTINE: Well, there are air rights that are reserved. They weren't all transferred. The building has at least --*

*THE COURT: So it would be your position that he does own some air rights.*

*Mr. AUGUSTINE: No. It wouldn't be that he owns them, but the question is that if he submits a plan and its seems reasonable -*

*THE COURT: What does he -- What does paragraph 7 mean if he doesn't own any air rights?*

25

>  MR. AUGUSTINE: *It means he has the right to build a structure, that if it's approved by the governmental agencies and the board sees that it doesn't pose any harm or risk, or inordinate cost to the coop as a whole, because the coop is a corporation, he's just a shareholder.*
>
>  THE COURT: *What does that mean?*
>
>  MR. AUGUSTINE: *It means —*
>
>  THE COURT: *I don't understand what you are saying.*
>
>  MR. AUGUSTINE: *Right —*
>
>  THE COURT: *— which means you're going have to commit the coop board to tell me: What does Paragraph 7 mean?*
>
>  ...
>
>  **MR. AUGUSTINE: *He has the same — anyone who buys a building, Your Honor, you have the right to build what the law permits. So if that means —***
>
>  **THE COURT: *No. He has — he specifically bought a right under Paragraph 7. And I'm asking you what that right is.***
>
>  **MR. AUGUSTINE: *Well, at the time that was written, the original owner, I believe, was his predecessor —***
>
>  **THE COURT: *It doesn't matter. The contract is the contract. It wasn't changed when he bought it. He bought that right. What does that right mean?***
>
>  MR. AUGUSTINE: *It's precisely as I said, Your Honor. Once —*
>
>  THE COURT: *I don't know what you said. Nor do I know what the Courts said.*
>
>  ...
>
>  **THE COURT: *The decisions don't — don't address this, because at least in this Court's mind, I don't see how you can build and build up without going into air rights or — you know, so I don't understand the decisions. I'm asking you for guidance.***

<u>Richard Zuckerman, attorney for Chicago Title Insurance Co.</u>

>  MR. ZUCKERMAN: *Well, let me emphasize, Your Honor, this is not a Chicago Title interest issue, has no bearing on Chicago Title, but the ruling of the Court, both the lower court and the Appellate Division, was that Mr. Brady has no right to any FAR. He has no right to any FAR that existed beforehand, he has no right to any increased FAR. That's what the Court held.*
>
>  THE COURT: *Yes. But it also quoted that and said he has these rights. What does that mean?*

26

       MR. ZUCKERMAN: *My understanding of those rights, Your Honor -- again, not a Chicago Title issue, and maybe I shouldn't have volunteered on this -- but my understanding of that, Your Honor, is that he has the same rights that are -- an owner of a fully built -- a building build to the full FAR would have.*

       THE COURT: *But that's not what Paragraph 7 says.*

       MR. ZUCKERMAN: *Then I can't add more light on that.*

       THE COURT: *It doesn't say that.*

       MR. ZUCKERMAN: *I can't -- can't shed light on that, Your Honor.*

       THE COURT: *Okay. That's it.*

(37:6 – 38:2)

<u>Mark Anesh, attorney for Stanley Kaufman</u>

       THE COURT: *How do you interpret the decision of the lower court? How would you interpret the decision of the lower court -- the decisions of the lower court and the Appellate Division?*

       MR. ANESH: *As I just said, even though I don't have a dog in the race,* "**my interpretation is he doesn't have the right to transfer any air rights, he doesn't have the right to consent or obtain a waiver. However, there is some space under applicable law that he is allowed to build or erect structures on -- under -- under the right -- under the space that was transferred.** *(Emphasis Added)*

<u>Justin Chu, attorney for Greenberg Traurig LLP</u>

THE COURT: *You were the transactional attorneys lawyers to the co-op board to Sherwood and Extell?*

MR. CHU: *To the coop. The seller.*

THE COURT: *To the coop. Oh, so your clients were the ones who interpreted these real estate contracts.*

MR. CHU: *Well, I'll - our clients were involved in rendering advice to the coop on land use issues and in connection with the initial sale to Extell, which did not close, and eventually in the sale to Sherwood which did close.*

*So again, why we are here in this lawsuit, if Your Honor is wondering, we are wondering the same thing. We have no duty to the plaintiff.*

27

*THE COURT: Did your client have an opinion as to what the lower court or Appellate Division meant or what Paragraph 7 means?*

*MR. CHU: I suspect that my client, the attorney, has an opinion --*

*THE COURT: But you don't know what it is.*

*MR. CHU: Well, I -- I wouldn't be the one to interpret. I'm not a real estate lawyer, so I would not be the best person to answer Your Honor's question on --*

*THE COURT: So you're just saying your client shouldn't be here.*

*MR. CHU: Correct.*

*THE COURT: Okay, I understand.*

Daniel Millstein, attorney for Frank McCourt

*MR. MILSTEIN: Now, again, if you want my unsolicited opinion or maybe solicited opinion, but in which my client doesn't have an interest as to where the limits are on this, it's clear what the plaintiff is saying is not that "I can build a structure, 20 feet, 15 feet. There's something I can build that was, although I won't tell you what it is that I want to build, my rights were impinged." What he says is, "I have the right, either to control through veto authority or ownership," the Court rejected both of those, " over --*

*THE COURT: The sale of air rights.*

*MR. MILSTEIN: "--overbuilding multiple stories above my roof, adding on, "that he basically has the right to add many stories above his roof to use all of that FAR.*

*THE COURT: And that was rejected by both -- by the courts.*

*MR. MILSTEIN: Right.*

*THE COURT: I understand.*

*MR. MILSTEIN: And that's because his roof wouldn't be a roof anymore, it would be in the middle of the building.*
    *(Laughter)*

*MR. MILSTEIN: And I think that's fairly good guidance as to what the term meant when it said "you have the right to use the roof." And, in addition to that --*

*THE COURT: It doesn't say that. It doesn't say "You have the right."*

*MR. MILSTEIN: It says --*

28

*THE COURT: In says, " In addition to the utilization of the roof."*

*MR. MILSTEIN: Right. And that's the context. The context is --*

*THE COURT: It says in addition to the utilization of the roof he has the right to construct or extend structures upon the roof or above the same to the extent that may from time to time be permitted under applicable law.*

*MR. MILSTEIN: Right, Your Honor. I think that the -- you interpret contracts in accordance with their context in the circumstances. The circumstances were that there was no more FAR at the time, so you weren't talking about building FAR, building floors.*

*THE COURT: But there was. When he bought it, the zoning had been changed.*

*MR. MILSTEIN: The contract was way before he bought it. That language was in place for years before he bought it.*

*THE COURT: But the language says, "From time to time be permitted under applicable law."*

*MR. MILSTEIN: Right. Well zoning --*

*THE COURT: And he bought with the contract.*

*MR. MILSTEIN: I understand.*

*THE COURT: And, at the time he bought, the applicable law allowed building on the roof.*

*Now, whether building on the roof meant all of the air rights, which clearly the Court says it didn't, but what does it mean?*

*MR. MILSTEIN: Well, again, I don't think it's necessary to resolve any of these motions, but I think the context is a clue. It says, "In addition to the utilization of the roof, you'll have the right to build and extend structures on it or above it." I think the structures that are built on or above have to be in context and supporting the use of the roof. If you're changing it and it's not going to be a roof anymore because you're building floors above it, I would say that that's not consistent. I think there's probably a lot of guidance as to what --*

**THE COURT: I agree with you. I think your interpretation makes sense, but how would you possibly build structures on the roof, even if it meant just one story or extending the structure, if there is a structure already there, without the use of air rights?**

29

*MR. MILSTEIN: Well, I think what counsel just told you, and I'm not an expert in that area of law at all, but he said --*

*THE COURT: Oh, so then what you're saying doesn't make -- it doesn't matter.*

*MR. MILSTEIN: Well, what I'm saying is that I thought his explanation was convincing, which is if you have zero extra FAR.*

***THE COURT: But you do have extra FAR when he bought and pursuant to the contract.***

*Since you're not an expert, I don't need to hear it.*

*MR. MILSTEIN: Okay.*

*THE COURT: Okay, I was just hoping that someone was. Okay, next. Who else? Is there anybody else? I guess not. (42:25 – 46:13).*

93.     The above admissions prove that all parties agree that pursuant to the Seventh Paragraph Footnote to the Schedule of Units, I have a right to build structures on or above the roof. The only way around that fact is to rewrite the contract, which is what Justice Kornreich did, and did not denying doing when confronted on September 10, 2014.

### C.     Attorneys' Admission During the March 18, 2014 Hearing Provide More Proof Defendants are Corrupt and Obstructing Justice

94.     The reason the Defendants would not ask the Justices to explain their decisions is because they knew doing so would prove judicial corruption: just like the lawyers found the decisions impossible to square, the Justices would also find themselves in the same impossible position. This would prove the Justices knew they were making deliberately deceptive decisions in attempts to void my apartment's contractual rights.

95.     As was shown through this transcript, it is impossible for the Justices to claim that my Unit was not given air rights while affirming that pursuant to paragraph seven, "plaintiffs have, in addition to the utilization of the roof, the right to construct or extend structures upon the

30

roof or above the same to the extent that may from time to time be permitted under applicable law."

### D. There was a clear indication of corruption, with a likelihood of bribery, which Defendants were made aware of after the oral arguments

96. At the March 18, 2014 hearing, Justice Kornreich swiftly came to the defense of Jeffrey Katz and Sherwood Equities. The court asked all other defense attorneys to give their interpretation of the prior decision and the contract, but she immediately excused Jeffrey Katz's attorney without asking anything, as shown in the transcript below, which comprises the entire exchange:

> *MR. SINGER: For the record, Justin Singer, Herrick Feinstein. We are representing Sherwood and Long Wharf, who were the purchasers, Mr. Katz, who was the principal of Sherwood, and Herrick Feinstein and Dennis Russo who are also named, who are the attorneys for the purchasers in this case.*
>
> *I guess I'll start first with Mr. Katz and Mr. Russo. As I said, Mr. Russo was acting as an attorney for the purchaser for the sale of the TDRs, and Mr. Katz is the principal of Sherwood. Mr. Brady is not alleged in the alter ego theory or anything else, to pierce the corporate veil.*
>
> **THE COURT: Basically they don't have anything to do with the deal.**
>
> *MR.SINGER: Correct, Your Honor.*
>
> **THE COURT: And that lawyer, again, posed no duty to --**
>
> *MR. SINGER: That's correct. That was my next point.*
>
> **THE COURT: Now, in terms of Sherwood, your argument is --**
>
> *MR. SINGER: The collateral estoppel argument. It's very clear that Mr. Brady did not own those rights and we did not need a waiver in order for those rights to be sold.*
>
> *THE COURT: Okay. Next.*
>
> (39:22 – 40:23)

31